Robert W. HAMLIN;  Jeanne E. Hamlin, Plaintiffs–Appellees,

v.

CHARTER TOWNSHIP OF FLINT; Charter Township of Flint Fire Department; Sally Shaheen Joseph; Greg Wright, Defendants–Appellants (97–1026).

Robert W. Hamlin, Plaintiff–Appellant (97–2105)/Cross–Appellee,

Jeanne E. Hamlin, Plaintiff,

v.

Charter Township Of Flint; Charter Township Of Flint Fire Department; Sally Shaheen Joseph; Greg Wright, Defendants–Appellees/Cross–Appellants (97–2129).

Nos. 97–1026, 97–2105, 97–2129.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 30, 1998.

Decided Jan. 8, 1999.

Dennis L. Gabrian (argued and briefed), James J. Parks (briefed), Gabrian & Parks, P.C., Bloomfield Hills, MI, for Plaintiffs.

Richard J. Suhrheinrich (argued), Stephen J. Rhodes (briefed), Kevin T. McGraw (briefed), Kristine M. Zayko (briefed), Foster, Swift, Collins & Smith, P.C., Lansing, MI, for Defendants.

Before: NELSON, CLAY, and GILMAN, Circuit Judges.

GILMAN, J., delivered the opinion of the court, in which CLAY, J., joined. NELSON, J. (pp. ——–——), delivered a separate opinion concurring in the judgment only.

## OPINION

GILMAN, Circuit Judge.

Robert W. Hamlin and his wife, Jeanne E. Hamlin, filed an action against the Charter Township of Flint, the Flint Fire Department, Fire Chief Greg Wright, and Township Supervisor Sally Shaheen Joseph (collectively "Flint"), alleging that Flint terminated Hamlin from his position as the Assistant Fire Chief in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213, and the Michigan Handicapper's Civil Rights Act ("MHCRA"), MICH. COMP. LAWS §§ 37.1101–37.1607. For the reasons set forth below, we AFFIRM the jury verdict in Hamlin's favor and the award of prejudgment interest, REVERSE the pension benefits' offset and the 50% attorneys' fee reduction as ordered by the district court, REINSTATE the award of attorneys' fees as determined prior to the 50% reduction, and REMAND the case for the entry of an amended judgment consistent with this opinion.

## I. BACKGROUND

Hamlin was employed by the Flint Township Fire Department as the Assistant Fire Chief. In September of 1992, Hamlin suffered a heart attack. Following five months of total disability, Hamlin was authorized by his cardiologist to return to work, but was advised to avoid strenuous physical activities such as front-line firefighting. For the next seventeen months, Hamlin performed his duties without complaint from his superiors.

After Hamlin declined offers to fill a vacancy in the Fire Chief position, however, newly appointed Fire Chief Greg Wright ordered Hamlin to perform the duties of a front-line firefighter, which he was unable to do because of his medical disability. On September 19, 1994, approximately three months after Wright's appointment, Flint terminated Hamlin because of his physical inability to engage in the strenuous duties of a firefighter. After his termination, Hamlin applied for and was granted disability pension benefits that he continues to receive.

On October 27, 1995, Hamlin filed suit against Flint, alleging that Flint unlawfully

terminated him in violation of the ADA and the MHCRA. Hamlin also asserted other state law claims that were ultimately dismissed either pursuant to an agreement between the parties or as a result of a partial summary judgment in favor of Flint.

At trial, Hamlin contended that Flint unlawfully terminated him on the basis of his inability to fight fires, claiming that front-line firefighting was not an essential part of his duties as the Assistant Fire Chief. Based upon Hamlin's proof that he was otherwise qualified and that Flint had failed to reasonably accommodate his disability, the district court, pursuant to *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173 (6th Cir. 1996), shifted the burden to Flint to prove that the challenged job requirement of being physically capable of fighting fires was an essential function of Hamlin's position.

The jury returned a $500,000 verdict in Hamlin's favor. Based on the verdict form submitted to the jury, the award did not separate damages awarded for the ADA claim from damages awarded for the MHCRA claim, nor distinguish between emotional distress damages and wage-related damages. The jury rejected the loss of consortium claim by Hamlin's wife, which she has not appealed. The district court subsequently granted Hamlin prejudgment interest, costs, and attorneys' fees. Regarding the request for attorneys' fees, the district court first made specific downward adjustments, and then further reduced the award by a flat 50% for the reasons enumerated in its decision.

Flint subsequently filed a motion to offset the jury verdict by the present value of Hamlin's disability pension. This value was determined to be $501,890.65. The district court granted Flint's motion, which had the effect of reducing the $500,000 jury verdict to zero.

Hamlin appeals the district court's complete offset of the jury verdict and its 50% reduction of the attorneys' fee award. Flint cross-appeals the prejudgment interest award in light of the district court's reduction of Hamlin's jury verdict to zero, and alternatively, the jury verdict.

## II. ANALYSIS

### A. The jury's verdict

#### 1. Flint's challenge to Monette

The ADA "prohibits employers from discriminating 'against a qualified individual with a disability because of the disability of such individual in regard to application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *Monette*, 90 F.3d 1173, 1178 (6th Cir.1996) (quoting 42 U.S.C. § 12112(a)). MHCRA claims "essentially track" federal disability discrimination law. *See id.* at 1178 n. 3.

In *Monette*, this court held that when an employer admits that it relied upon a disability in making an adverse employment decision, an employee may establish a *prima facie* case of employment discrimination under the ADA by showing that he or she (1) has a disability, and (2) is "otherwise qualified" for the position despite the disability either "(a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Id.* at 1186. If the employee challenges a purported job criterion as not essential and seeks its elimination, the burden then shifts to the employer to establish that the "challenged job criterion is essential, and therefore a business necessity," or that its elimination "will impose an undue hardship upon the employer." *Id.* In particular, the court stated that "if a disabled individual is challenging a particular job requirement as unessential, the employer will bear the burden of proving that the challenged criterion is necessary." *Id.* at 1184. Flint seeks a reversal of *Monette*.

Hamlin presented proof at trial that front-line firefighting is not an essential function of the Assistant Fire Chief position. He pointed out that the key functions of his job were supervisory and administrative in nature, as distinguished from those of a firefighter, which include 24-hour shifts, being the primary responder to emergencies, and engaging in strenuous front-line fire suppression, search, and rescue. In the event that the

Assistant Fire Chief is needed at the scene of an emergency, Hamlin contended that his role at the scene would be that of an "Incident Commander," who is the one responsible for getting the right equipment to the scene, supervising front-line firefighters, and assuring that the fire department's response is safe and appropriate under the circumstances.

Hamlin argues that he would have been otherwise qualified to continue working if Flint had eliminated the nonessential firefighting functions from his position. In other words, Hamlin argues that because firefighting is not an essential function of the job, Flint could have reasonably accommodated his disability without undue hardship. Hamlin therefore claims that he presented sufficient evidence at trial to establish his *prima facie* case, thus shifting the burden to Flint of establishing that firefighting is an essential function of the Assistant Fire Chief position.

Although the district court criticized *Monette* in great detail, it properly applied *Monette* to shift the burden from Hamlin to Flint to prove that front-line firefighting was an essential element of Hamlin's job. According to *Monette,* once the disabled individual contends that a particular job requirement is unessential, the burden shifts to the employer to prove that the challenged requirement is necessary. *See Monette,* 90 F.3d at 1184. The ADA prohibits an employer from using qualification standards to deny employment "unless the standard ... is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6). *Monette* states that the "clear import" of 42 U.S.C. § 12112(b)(6) of the ADA "dictates that employers bear the burden of proving that a challenged job requirement is 'job-related.' " *Monette,* 90 F.3d at 1184. Although an employer may establish minimum physical standards or qualifications for a position, "it will have to show that it actually imposes such requirements on its employees...." 29 C.F.R. § 1630.2(n), App.

■ *Monette* is the law of this circuit, and as such this panel is not free to overturn it. *See Meeks v. Illinois Cent. Gulf R.R.,* 738 F.2d 748, 751 (6th Cir.1984) ("[A] panel of this court may not overrule a previous panel's decision. Only an en banc court may overrule a circuit precedent, absent an intervening Supreme Court decision.") (citing *Timmreck v. United States,* 577 F.2d 372, 376 n. 15 (6th Cir.1978), *rev'd on other grounds,* 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979)). Furthermore, we find that *Monette* correctly interprets the ADA to require the employer to establish that the challenged function is essential. Accordingly, if the employer cannot prove its affirmative defense, then the ADA bars the employer from terminating an employee based upon the employee's inability to perform that function.

■ In the present case, Flint admitted that it terminated Hamlin because of his physical inability to fight fires. Hamlin submitted proof that he could perform the duties of the Assistant Fire Chief, as long as those duties did not involve firefighting. Hamlin's evidence was sufficient to raise a genuine issue as to whether firefighting is an essential function of the position. The district court therefore properly placed the burden on Flint to prove that firefighting was in fact an essential function of Hamlin's job, thereby justifying its termination of his employment. *See Monette,* 90 F.3d at 1186.

■ Flint further argues that if we decline to reverse *Monette,* we should at least limit *Monette* to disallow jury instructions that shift the burden of persuasion to defendants. Jury instructions are reviewed "as a whole to determine whether they adequately inform the jury of relevant considerations and provide a basis in law for the jury to reach a decision." *Beard v. Norwegian Caribbean Lines,* 900 F.2d 71, 72 (6th Cir.1990). "A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as a whole, are misleading or give an inadequate understanding of the law." *Bowman v. Koch Transfer Co.,* 862 F.2d 1257, 1263 (6th Cir. 1988) (citing *Coughlin v. Capitol Cement Co.,* 571 F.2d 290 (5th Cir.1978)).

■ The jury instruction to which Flint objects states:

The defendants have the burden of proving by a preponderance of the evidence that the ability to perform all of the duties of a firefighter is an essential function of the assistant fire chief's position. In this case, the burden of proving whether fire fighting, with all of its responsibilities, is an essential function. That burden is on the defendants.

The district court gave this instruction after stating that Hamlin first had to establish a *prima facie* case of disability discrimination. It also reiterated to the jury that it is the plaintiff's burden to prove that he is otherwise qualified to perform all of the essential functions of the job. In addition, the district court defined all of the terms involved and the factors that the jury could evaluate in determining the essential functions.

Flint insists that the challenged instruction improperly placed on it a burden of persuasion, rather than simply a burden of production. It argues that the instruction constitutes reversible error because the burden of persuasion should always remain with the plaintiff.

The fallacy of Flint's argument is that the challenged jury instruction did not place the overall burden of persuasion on Flint. That burden always remained with Hamlin. The instruction simply placed on Flint the burden of proving that firefighting was an essential function of Hamlin's job. This is consistent with *Monette*, which properly shifts the burden of persuasion to the employer on the "essential function" issue and also with regard to an employer's assertion that a proposed accommodation will impose an undue hardship. *See Monette*, 90 F.3d at 1184. The district court's challenged jury instruction was therefore accurate and, taken as a whole, the jury instructions more than adequately informed the jury of the law in this circuit.

*Monette* fully comports with the ADA, and the district court correctly applied *Monette* when it shifted the burden to Flint to prove what amounts to an affirmative defense. We therefore reject Flint's *Monette*-based challenges.

## 2. Flint's claim that Hamlin's disability was a "direct threat" to the safety of Hamlin and others

Flint repeatedly sought a declaration that, as a matter of law, Hamlin was not a qualified individual because his inability to fight fires created a "direct threat" to the safety of Hamlin and others. The district court denied Flint's motions on this issue, which we review under a *de novo* standard. *See, e.g., Williams v. Nashville Network*, 132 F.3d 1123, 1130–31 (6th Cir.1997) (applying a *de novo* standard of review where the district court denied plaintiff's motion for judgment as a matter of law, concluding that whether the failure to hire an applicant violated Title VII was a question for the jury).

An individual who poses a direct threat to the health or safety of the individual or others in the workplace is not entitled to the ADA's protection. *See* 42 U.S.C. § 12113(b). A direct threat means that there is "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r). To determine if an individual poses a direct threat, the trial court should evaluate the following factors: "(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm." 29 C.F.R. § 1630.2(r).

As a defense to Hamlin's claims, Flint argued that Hamlin posed a direct threat because of his physical inability to engage in active firefighting duties. Flint cites cases in which hospital employees were held to pose a direct threat due to their HIV-infected status, coupled with their interaction with patients and the unpredictability of the work environment. *See, e.g., Mauro v. Borgess Med. Ctr.*, 886 F.Supp. 1349, 1352–54 (W.D.Mich.1995) (granting summary judgment to a hospital where an HIV-infected surgical technician posed a small but deadly risk to patients, and the hospital could not eliminate the risk due to the unpredictable nature of emergency medicine).

Flint presented witnesses describing the unpredictability of a firefighter's work envi-

ronment, the need for firefighting capabilities generally, and the possibility that the first responder to a scene might be in a position to rescue someone trapped inside a building. It also presented evidence regarding the Flint Township Fire Department's practice of the "two in / two out" rule, which provides that when two firefighters go into a burning building for fire suppression or rescue, another pair of firefighters remains outside and ready to go in to assist if necessary. Hamlin responded by pointing out that he was the Assistant Fire Chief, which is not equivalent to a firefighter position. *See EEOC v. City of St. Paul,* 671 F.2d 1162, 1166–67 (8th Cir.1982) (analyzing the distinctions in the physical performance duties of a fire chief as opposed to a firefighter).

Although Flint's arguments are not without weight, the district court correctly found that a genuine issue of material fact existed on this point that required submission to a jury. The communicable disease cases upon which Flint relies can easily be distinguished from Hamlin's case, and certainly do not establish as a matter of law that Hamlin posed a direct threat in his position, especially given that the trial involved much debate over what the essential functions of the position were. The district court thus had before it ample evidence to create a genuine issue of material fact regarding whether Hamlin posed a direct threat.

In addition, "[a]n employer ... is not permitted to deny an employment opportunity to an individual with a disability merely because of a slightly increased risk. The risk can only be considered when it poses a significant risk, i.e., high probability of substantial harm; a speculative or remote risk is insufficient." 29 C.F.R. § 1630.2(r) (citations omitted). The proof tendered in the present case did not establish as a matter of law that there was a high probability of potential harm because of Hamlin's physical limitations, or that the alleged risk was anything more than speculative or remote. Flint simply relied upon its own "subjective perceptions" that all line officers in the Fire Department do nothing other than directly fight fires. There was thus no error in the district court's reserving this issue for the jury.

### 3. Flint's argument about the inconsistency of Hamlin's positions

■ Flint also argues that it is incongruous for Hamlin to maintain that he is otherwise qualified under the ADA, given that he applied for and is receiving benefits on the basis of his disability. We find, however, that although Hamlin applied for disability pension benefits, he never stated that he could not perform his duties as the Assistant Fire Chief. Rather, Hamlin contended that he was physically unable to fight fires. The fact that the disability board granted Hamlin disability pension benefits on that basis is not inconsistent with Hamlin's contention that his essential job functions did not include firefighting.

### B. The district court's post-verdict reduction of the $500,000 verdict to zero

#### 1. Standard of review

■ Because it is a question of legal policy, we review a district court's decision to deduct collateral benefits from a jury discrimination award under a *de novo* standard. *See Rasimas v. Michigan Dep't of Mental Health,* 714 F.2d 614, 627–28 (6th Cir.1983) (rejecting the premise that the district court had the discretion to offset collateral unemployment benefits against awards in a discrimination case, based on this court's conclusion that unemployment benefits and back pay awards serve radically different purposes); *see also Jackson v. City of Cookeville,* 31 F.3d 1354, 1359 (6th Cir.1994) ("The collateral source rule is a substantive rule of law ...").

We acknowledge, however, that other circuits, as well as our own under unique circumstances, have applied an abuse of discretion standard in analyzing the issue of whether to offset collateral source benefits. *See, e.g., Jackson,* 31 F.3d at 1359 (holding that although collateral source benefits should not ordinarily be deducted in discrimination cases, the district court did not abuse its discretion by deducting such benefits from the plaintiff's front pay award when the plaintiff himself had requested the jury to

subtract the collateral benefits from his back pay award); *Lussier v. Runyon,* 50 F.3d 1103, 1107–10 (1st Cir.1995) (surveying other circuits regarding their positions on the appropriate standard of review to be used in evaluating a district court's decision to offset collateral source benefits from front pay awards, and concluding that the district court retained discretion to offset such benefits).

We find the reasoning of the First Circuit in *Lussier* unpersuasive because it failed to evaluate the general policy considerations that form the basis of the collateral source rule. Instead, the *Lussier* court concluded that a district court has discretion to offset collateral benefits from front pay awards in discrimination cases under Title VII of the Civil Rights Act of 1964 and under the Rehabilitation Act of 1973. *See id.* at 1107–10. It reasoned that the decision to offset such benefits logically falls within the district court's broad discretion to "award or withhold front pay according to established principles of equity and the idiocratic [sic] circumstances of each case." *Id.* at 1108.

Although we do not disagree with the general principle that a district court has discretion in awarding front pay, we believe that the decision of whether to offset collateral pension benefits from a discrimination award is a policy determination that should not be left to the individual discretion of each district court. *See Rasimas,* 714 F.2d at 628. In *Rasimas,* the court stated:

> We disagree [that the district court should have discretion in determining when to deduct unemployment compensation from a backpay award]. Title VII is intended to establish a national backpay policy. That policy is to make 'persons whole for injuries suffered from past discrimination.' *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). It is inconsistent with this national policy to argue ... that two identically situated claimants may be made 'whole' by radically different backpay awards. To allow district courts to determine just how 'whole' a claimant will be is antagonistic to the establishment of a uniform national policy.

*Id.* at 628. We reach the same conclusion, and hold that a district court's decision of whether to deduct collateral benefits from a discrimination award is a legal question subject to *de novo* review.

2. *Collateral source benefits should not be deducted from a jury's damage award for discrimination violations*

■ In deciding to reduce Hamlin's jury verdict from $500,000 to zero, the district court stated that it found this court's precedents on the subject to be "less than clear and consistent, ... confusing and, perhaps even contradictory...." To the contrary, we find that a careful analysis of our precedents leads to a reasonably consistent application of the collateral source rule in the context of discrimination cases.

■ "The collateral source rule is a substantive rule of law that bars a tortfeasor from reducing damages owed to a plaintiff by the amount of recovery the plaintiff receives from sources that are collateral to the tortfeasor." *Jackson v. City of Cookeville,* 31 F.3d 1354, 1359 (6th Cir.1994). In *Jackson,* the plaintiff won a jury verdict based on a violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634. The trial judge reduced the jury verdict by an amount representing the plaintiff's expected future pension benefits. On appeal, the plaintiff argued that "his pension plan payments [were] payments from a collateral source and should not have been deducted from his front pay award by the district court's remittitur." *Jackson,* 31 F.3d at 1359. This court noted that "since [the plaintiff's] retirement, he ha[d] been receiving pension benefits from the Tennessee Consolidated Retirement System, which appear[ed] to be an entity separate and distinct from its employer, though his employer paid into the system for [his] benefit." *Id.* In light of the collateral source of the benefits, the court announced the following general rule:

> Because the victim rather than the perpetrator of discrimination should profit, courts that have considered this question have held that pension payments from a collateral source are not to be deducted

from an Age Discrimination in Employment Act award.

*Jackson*, 31 F.3d at 1360.

The court then stated, however, that it was "unable to apply this general rule" because the plaintiff had presented a chart that had asked the jury to subtract the pension benefits from his back pay award, which the jury did. *Id.* Because the jury had followed the plaintiff's suggestion to subtract his pension benefits from the back pay award, but then failed to subtract them from the front pay award, the court believed that the jury had created an irreconcilable result. *See id.* Accordingly, it concluded that because the plaintiff himself had requested a damage award that "included a deduction of benefits from his back pay, the district court did not abuse its discretion in making the award rational by subtracting the benefits from the front pay award as well." *Id.*

Because the *Jackson* plaintiff acted against his own interests and contrary to the collateral source rule, *Jackson* should not be regarded as precedent for the proposition that this court endorses the reduction of jury verdicts by collateral source benefits. Such a conclusion would be contrary to the general rule as set forth in *Jackson* itself. *See id.* at 1360. Rather, the ultimate result of *Jackson* should be viewed as an unusual and inapplicable exception to the collateral source benefits rule.

In 1996, this court decided *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160 (6th Cir.1996). *Thurman* held that the plaintiff's unemployment benefits and workers' compensation benefits were collateral source benefits, and thus should not have been deducted from the jury's award of back pay for racial discrimination. *See id.* at 1171 (following *Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614 (6th Cir.1983), and *Knafel v. Pepsi–Cola Bottlers of Akron, Inc.*, 899 F.2d 1473 (6th Cir.1990)). Before reaching this conclusion, however, the court distinguished *Hawley v. Dresser Industries, Inc.*, 958 F.2d 720 (6th Cir.1992), by stating that *Hawley* "held that pension benefits should be deducted from a backpay award in an ADEA case." *Thurman*, 90 F.3d at 1171. In further describing the *Hawley* holding, the court stated:

> The purpose of the backpay award [in *Hawley*] was to restore the employee to the position he would have been in if the discrimination had not occurred. Because the [*Hawley*] plaintiff would not have been entitled to pension benefits if he had remained employed, the pension benefits he received were deducted from the award.

*Thurman*, 90 F.3d at 1171.

Although the *Thurman* court's statements about *Hawley* were all true, those statements should not be separated from the peculiar facts of that case. In *Hawley*, a decision that predated *Jackson* by two years, this court affirmed the deduction of certain pension benefits from the plaintiff's age discrimination award. *See Hawley*, 958 F.2d at 725–26. Specifically, the court found that defendants were entitled to offset certain amounts that represented *additional* pension benefits to which the defendant company had switched plaintiff as a form of severance pay funded by his employer that "plaintiff received because of an early retirement subsidy and defrayal of his pension benefits until age 65 instead of taking benefits at age 62 when he was discharged." *Id.* at 722. These offsets served to mitigate defendants' liability by giving defendants credit for money that the defendant company was already providing to plaintiff in the form of company pension benefits. In other words, the court did not permit the plaintiff to benefit fully from company-funded severance alternatives and also keep a jury verdict based on the severance. Thus *Hawley* did *not* involve collateral source benefits of any kind. Accordingly, *Hawley* is distinguishable from the present case.

Applying the collateral source rule in the employment discrimination context prevents the discriminatory employer from avoiding liability and experiencing a windfall, and also promotes the deterrence functions of discrimination statutes. *See Thurman*, 90 F.3d at 1171 ("Permitting an employer to benefit from other sources of income like unemployment compensation and worker's compensation would not serve the deterrence function of [Title VII].... [U]nemployment compen-

sation is not paid to discharge a liability of the employer. It is paid to carry out the social policies of the state.").

These decisions of our court are consistent with the holdings in other circuits. *See, e.g., Doyne v. Union Elec. Co.,* 953 F.2d 447, 451–52 (8th Cir.1992) (finding that pension payments from a collateral source should not have been deducted from the plaintiff's jury verdict in an age discrimination case); *EEOC v. O'Grady,* 857 F.2d 383, 389 (7th Cir.1988) (affirming the district court's refusal to offset pension benefits from an age discrimination award).

### 3. The test for determining whether payments are collateral source benefits

The Fifth Circuit in *Phillips v. Western Company of North America,* 953 F.2d 923, 932 (5th Cir.1992), set forth the following factors to determine whether pension benefits are collateral:

(1) whether the employee makes any contribution to funding of the disability payment; (2) whether the benefit plan arises as the result of a collective bargaining agreement; (3) whether the plan and payments thereunder cover both work-related and nonwork-related injuries; (4) whether payments from the plan are contingent upon length of service of the employee; and (5) whether the plan contains any specific language contemplating a set-off of benefits received under the plan against a judgment received in a tort action.

We find the use of these factors to be both helpful and persuasive in evaluating the issue before us.

In the present case, each of the five factors supports the non-deductibility of Hamlin's disability pension benefits. Hamlin made contributions to fund his pension pursuant to section 38.552(3) of the Michigan Compiled Laws. Contributions by the employer "were not made to discharge any liability or obligation of respondent, but to carry out a policy of social betterment for the benefit of [the town of Flint]." *Rasimas,* 714 F.2d at 628 n. 13 (holding that unemployment benefits are collateral and should not be deducted from back pay awards) (quoting

*NLRB v. Gullett Gin Co.,* 340 U.S. 361, 364, 71 S.Ct. 337, 95 L.Ed. 337 (1951)). The plan arises pursuant to the Michigan statute and a collective bargaining agreement. A disability pension under the plan is available to cover both work-related and non-work-related disabilities, payments are contingent upon length of service, and the only language contemplating the offsetting of other payments pertains specifically to workers' compensation benefits stemming from the same injury. *See* MICH. COMP. LAWS § 38.556. The evidence thus establishes that Hamlin's disability payments are collateral source benefits.

### 4. The district court erred in offsetting Hamlin's pension benefits

Based on its analysis of this court's decisions, the district court articulated four rules regarding collateral benefits:

First, employer defendants in employment discrimination cases are subject to the rule that tortfeasors should not benefit by way of offset from payments made to employees from collateral sources. Second, under the collateral source rule, payments from an entity that is separate and distinct from an employer generally should not be used to offset damage awards in Title VII and ADEA cases. Third, also under the collateral source rule, payments which employers incur pursuant to a State or Federal social policy, as opposed to an independent, voluntary obligation of the employer, should not offset damage awards in Title VII and ADEA cases. Finally, any benefits that a plaintiff would not have earned had he or she continued working should be offset.

(footnote omitted). We agree with the district court's first three rules, but disagree with the general applicability of its fourth rule. In Hamlin's case, we find that the district court's fourth rule directly contradicts the first three rules. The fourth rule would only be relevant if the benefit were *not* from a collateral source, as in *Hawley v. Dresser Industries, Inc.,* 958 F.2d 720 (6th Cir.1992), which is not the case with Hamlin's pension benefits. As a general proposition, the district court's purported fourth rule would swallow up the entire logic of the

collateral source rule long adhered to by this and other circuits.

In the case before us, the district court has already ruled that Hamlin's pension payments were collateral source benefits. Before trial, Hamlin filed a motion *in limine* to exclude evidence of his receipt of these payments on that basis. The district court agreed, ruling that Flint could not introduce the amount of those payments because they were governed by the collateral source rule and would be handled, if there was a judgment for Hamlin, at that time. Even Flint acknowledges that the district court's "decision was entirely premised on the judge's assumption that the disability benefits were from an independent and 'collateral' source." This factual issue having been determined, we hold as a matter of law that the district court should not have deducted the pension benefits from Hamlin's damage award.

### 5. Hamlin's challenges to the district court's method of reducing the verdict

Hamlin raises three arguments regarding the method by which the district court reduced the jury verdict to zero. He first contends that the district court erred in ignoring Michigan law about offsets, given that the verdict did not distinguish between the ADA claim and the MHCRA claim. Next, Hamlin argues that the district court erred in offsetting the pension benefits from whatever portion of the jury verdict constituted an award for emotional distress as opposed to wage-related damages. Hamlin's final objection attacks the calculation of the present value of his pension benefits. We tend to agree with Hamlin's first two arguments, but are inclined to believe that he waived the third by his actions in the district court. Given our reversal of the offset in its entirety, however, Hamlin's arguments on this issue are moot and need not be explored any further.

### C. The district court's award of prejudgment interest

After the jury reached a verdict in Hamlin's favor, he requested prejudgment interest in the amount of $12,075.81. Instead, the court awarded him $7,097.85. Hamlin does not appeal the amount awarded.

The district court later reduced the jury verdict from $500,000 to zero, but failed to mention what effect, if any, the reduction had on the prejudgment interest award. Flint appeals the award of prejudgment interest in light of the district court's complete offset of the jury verdict. Flint argues that "it is illogical to award such interest to a plaintiff who, as a practical matter, recovers no money damages." Because we are reversing the district court's offset and reinstating the jury verdict of $500,000, Flint's argument regarding the prejudgment interest award is moot. The prejudgment interest award of $7,097.85 therefore stands.

### D. The district court's reduction of Hamlin's attorneys' fee request by 50%

#### 1. The district court's award

Hamlin petitioned the district court for an award of attorneys' fees in the amount of $105,645, based on services rendered at $175 per hour. Instead, the district court granted Hamlin's petition for attorneys' fees in the greatly reduced amount of $50,127.50.

In calculating Hamlin's attorneys' fee award, the district court found that the rate of $175 per hour for Hamlin's attorneys was a reasonable rate and that it was reasonable to have two attorneys present and prepared for trial. But the district court reduced the total amount of $105,645 by $4,865 for time spent on numerous claims that the court felt lacked merit, and by $525 for one claim where the court found that the preparation time was minimal. Hamlin does not appeal these reductions. After reducing the total to $100,255, the district court further cut this revised amount by a flat 50% to $50,127.50. Hamlin appeals the district court's reduction of the attorneys' fee award by the 50%.

#### 2. Abuse of discretion standard

■ "We usually sustain a district court's award and division of attorneys' fees absent an abuse of discretion." *Kalyawongsa v. Moffett,* 105 F.3d 283, 289 (6th Cir.1997) (quoting *Dean v. Holiday Inns, Inc.,* 860

F.2d 670, 672 (6th Cir.1988)). "An abuse of discretion will be found where the district court plainly erred." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1170–71 (6th Cir.1996) (citing *In re Bendectin Litig.*, 857 F.2d 290, 307 (6th Cir.1988)).

### 3. The standards for awarding attorneys' fees to a prevailing party

On December 3, 1996, the jury returned a $500,000 verdict in Hamlin's favor. The jury found that Flint had violated the ADA and the MHCRA. Both statutes provide that prevailing parties are entitled to reasonable attorneys' fees. *See* 42 U.S.C. § 12117(a) (ADA attorneys' fee provision); MICH. COMP. LAWS § 37.1606 (MHCRA attorneys' fee provision). In *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), the Fifth Circuit enunciated twelve factors that trial courts may consider in calculating reasonable attorneys' fee awards. *See Blanchard v. Bergeron*, 489 U.S. 87, 93, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) ("*Johnson*'s 'list of 12' thus provides a useful catalog of the many factors to be considered in assessing the reasonableness of an award of attorney's fees . . ."). The twelve factors are as follows:

(1) the time and labor required;

(2) the novelty and difficulty of the questions;

(3) the skill requisite to perform the legal service properly;

(4) the preclusion of employment by the attorney due to acceptance of the case;

(5) the customary fee;

(6) whether the fee is fixed or contingent;

(7) time limitations imposed by the client or the circumstances;

(8) the amount involved and the results obtained;

(9) the experience, reputation, and ability of the attorneys;

(10) the "undesirability" of the case;

(11) the nature and length of the professional relationship with the client; and

(12) awards in similar cases.

*Hensley v. Eckerhart*, 461 U.S. 424, 430 n. 3, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (summarizing the *Johnson* factors).

This court has held that the trial court may apply the *Johnson* factors either after the court's initial valuation of the hours reasonably expended at a reasonable rate or during its initial valuation. *United Slate, Tile & Composition Roofers v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502–03, 503 n. 3 (6th Cir.1984) (stating that the trial court should first conduct the initial valuation, then examine the award against several factors, including the *Johnson* factors, but also noting that trial courts usually subsume the analysis of those factors within the initial calculation). The district court should also "provide a concise but clear explanation of its reasons" for its conclusions regarding an attorneys' fee award. *Hensley*, 461 U.S. at 437, 103 S.Ct. 1933.

### 4. The district court's rationale for the reduction of the attorneys' fee award by 50% was an abuse of discretion

The district court stated that it was reducing the $100,255 revised total by 50% because:

(1) This case was very close at both the summary judgment phase and at trial; (2) Plaintiffs' requested relief was well in excess of $1,000,000; (3) Plaintiffs' counsel's representation is pursuant to a ⅓ contingency fee contract; and (4) The Court expended a great deal of time and effort in researching and considering important matters in this case that counsel in this matter failed to identify and/or properly discuss. With this deduction, the attorneys' fees stand at $50,127.50. The Court finds that these fees are proportional to Plaintiffs' success at trial and the skill that counsel brought to bear on this matter. *See, e.g., United Slate, Tile & Composition v. G & M Roofing and Sheet Metal Company, Inc.*, 732 F.2d 495, 502 (6th Cir. 1984). Therefore, this is the amount of fees that the Court will award.

The district court's reasons do not support the 50% cut. As to the first factor, the closeness of the issues actually supports a finding that the time expended by Hamlin's

attorneys was reasonable and necessary for Hamlin to prevail at trial. If anything, the closeness of a case on the merits would tend to justify the skilled services of the prevailing attorneys, not be a basis to reduce their award.

■ Secondly, the fact that Hamlin sued for more than $1,000,000, but the jury awarded only $500,000, is not a proper basis for reducing the fee request. The law does not require plaintiffs to recover 100% of what they sue for in order to be considered successful at trial. Otherwise, virtually no plaintiff would ever recover reasonable attorneys' fees. In *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court stated:

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.

Furthermore, the district court had already deducted over $5,000 for claims that it felt lacked merit or did not justify the preparation time expended.

■ Regarding the third factor, the district court's reduction of the award based on Hamlin's contingency fee arrangement with his attorneys was also inappropriate. The district court cited *United Slate* to support its consideration of the contingency fee as a factor. The district court's reliance, however, was misplaced. *United Slate* involved the issue of whether an attorneys' fee award should be limited by the contingent fee contract between the attorneys and the plaintiff. *See United Slate,* 732 F.2d at 501, 503. Rejecting consideration of the plaintiff's contingency fee arrangement as a factor in the overall determination of a reasonable fee, the court said, "the determination of a reasonable fee is to be conducted by the district court regardless of any contract between plaintiff and plaintiff's counsel." *Id.* at 504. The court did note, however, that the contingent nature of the fee may be considered

when calculating the reasonable hourly billing rate to provide an allowance for contingent risks assumed by the attorney. *See id.* at 503. In other words, the reasonable hourly rate may be adjusted *upward* to account for the risk of non-payment inherent in a contingency fee arrangement. But to use the arrangement as the basis for a *downward* adjustment from an otherwise reasonable rate is illogical and unjustified. The district court, therefore, plainly erred in using Hamlin's contingency fee arrangement to reduce his attorneys' fee award.

■ The district court's final factor was that it had to spend a great deal of time on "important matters" that counsel failed to properly identify or discuss. This cryptic statement does not provide a "clear explanation of its reasons for the fee award" as required by *Hensley. See Hensley,* 461 U.S. at 437, 103 S.Ct. 1933. Furthermore, time spent by the court has never been considered as a basis to subtract from time reasonably spent by counsel. Indeed, if more time had been spent by Hamlin's counsel to further aid the court, the fee request would presumably have been proportionately higher.

In conclusion, we find that the district court's 50% reduction in the attorneys' fees constituted an abuse of discretion. If it were unclear what the proper award should be in this case, we would remand. In this instance, however, the district court has already approved the hourly rate, analyzed in detail the hours expended, and set aside $4,865 for hours that it found were expended on unmeritorious claims and another $525 for one claim that it found involved minimal preparation time. We are therefore reinstating the award at $100,255, the amount that the district court had calculated as appropriate prior to the 50% reduction.

### III. CONCLUSION

For all of the reasons set forth above, we AFFIRM the $500,000.00 jury verdict and the $7,097.85 award of prejudgment interest, REVERSE the pension benefits' offset and the 50% reduction of attorneys' fees, REINSTATE the $100,255.00 award of attorneys' fees, and REMAND the case for the entry of

an amended judgment consistent with this opinion.

DAVID A. NELSON, Circuit Judge, concurring in the judgment only.

I concur in the court's judgment, believing myself constrained to do so by prior published caselaw of this circuit. Were we writing on a clean slate, however, I would favor remanding the case for a new trial. If free to do so, I would, among other things, direct the district court to follow what I take to be conventional norms in charging the jury on the burden of proof. I would also accord the district court discretion to offset prospective collateral benefits against the plaintiff's prospective wage loss.

## I

Turning first to the burden of proof question, I start with the proposition that the ADA prohibits disability-based discrimination against "a qualified individual with a disability." 42 U.S.C. § 12112. The quoted phrase is a term of art. It is defined in 42 U.S.C. § 12111(8) as "an individual with a disability who, with or without reasonable accommodation, *can perform the essential functions of the employment position* that such individual holds or desires." (Emphasis supplied.)

If one were simply to read what the statute says, one might suppose that a person claiming to have been discriminated against in violation of the ADA would have the burden of proving his ability to perform the "essential functions" of the position in question. One might further suppose that in the event of a disagreement as to whether a given job function is or is not "essential," the plaintiff would have the burden of proving it is not. In this circuit, however, one would be wrong.

*Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173 (6th Cir.1996)—a decision that binds this panel, of course, just as it bound the district court—holds that "if a disabled individual is challenging a particular job requirement as unessential, the employer will bear the burden of proving that the challenged criterion is necessary." *Id.* at 1184. *Monette* thus treats the matter of "essential

functions" not as an element of the plaintiff's case, but as an affirmative defense—at least where the plaintiff wants it that way.

In taking this tack, the *Monette* opinion (see 90 F.3d at 1183–84) blurs the distinction between "undue hardship"—a showing of which, under 42 U.S.C. § 12112(b)(5)(A), is an affirmative defense to a claim that the employer has not made the requisite accommodations to the claimant's limitations—and "essential functions," an ability to perform which would seem to have been made an element of the plaintiff's case under §§ 12112(a) and 12111(8). Similarly, *Monette* (see 90 F.3d at 1184) blurs the distinction between essential functions and "business necessity"—a showing of which, under 42 U.S.C. § 12112(b)(6), can be an affirmative defense to the prohibited use of "qualification standards, employment tests, or other selection criteria" that tend to screen out people with disabilities.

As the district court pointed out at an early stage of the proceedings in the case at bar, the *Monette* panel's analysis "equates a statutory prohibition (*i.e.,* no unlawful or pretextual screening mechanisms) with the creation of a legal burden." *Hamlin v. Charter Township of Flint,* 942 F.Supp. 1129, 1137 (E.D.Mich.1996). Such an equation, as the district court went on to explain, is highly problematic:

"The mere fact that an act is prohibited does not place the burden of proving that it was not done upon the one accused of doing it. Here, Plaintiffs [sic] simply challenging a job function as unessential (and, presumably, pretextual) should not be equated with requiring the employer to prove it is essential. To do so effectively turns on its head the burden of proof in an ADA case because rather than the plaintiff being required to show that he or she is capable of performing all of the essential functions of a job, all he or she need do is challenge the essentiality of one of the job functions and, thereby, shift the burden of proof on one of the critical factors for showing that he or she is qualified for the job. Such a shift is clearly unwarranted because it allows a plaintiff to avoid mak-

ing his or her prima facie case." *Id.* (footnote omitted).

In practice, as the *Monette* panel suggested in a footnote, it may not be easy to distinguish between a dispute over the essentiality of a particular job requirement and a dispute over a particular screening mechanism or a particular proposed accommodation. See *Monette,* 90 F.3d 1173, 1182 n. 8. Congress having drawn these distinctions, however, it seems to me that the courts ought to honor them. It is unwarranted, in my view, to let the plaintiff escape the burden of proving the statutory elements of his case because of a possible overlap with statutory defenses which the defendant may not even choose to assert.

Under traditional burden of proof concepts, as the Tenth Circuit has said, it would be up to the plaintiff to establish

"(1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is ... *he is able to perform the essential functions of the job;* and (3) that the employer terminated him because of his disability." *White v. York Int'l Corp.,* 45 F.3d 357, 360–61 (10th Cir.1995) (footnote omitted) (emphasis supplied).

In the case at bar there was conflicting evidence as to whether the physical ability to fight fires was one of the essential functions of the assistant fire chief's position. The traditional approach, as exemplified in *White,* would have been to instruct the jury that the plaintiff had the burden of proof—*i.e.,* that the plaintiff bore the risk of non-persuasion—on this issue. What the district court actually told the jury, however, was just the opposite: "The defendants have the burden of proving by a preponderance of the evidence that the ability to perform all of the duties of a firefighter is an essential function of the assistant fire chief's position."

This instruction was completely faithful to *Monette,*[1] so it cannot constitute reversible error. Like the district court, however, I believe that the instruction was simply wrong.

To say that the "overall" burden of persuasion remains with the plaintiff does not solve the problem, in my opinion. If a misguided jury instruction leads the jury to decide the "essential function" issue incorrectly, the plaintiff may well be enabled to carry an "overall" burden which he would not otherwise have been able to sustain.

## II

As to the collateral benefit issue, "[t]he weight of authority unquestionably favors the view that decisions about whether to consider the plaintiff's receipt of collateral benefits in gauging the appropriateness and amount of front pay, and if so, how to calibrate the scales, lie within the equitable discretion of the trial court." *Lussier v. Runyon,* 50 F.3d 1103, 1108 (1st Cir.1995). Citing, however, *Rasimas v. Michigan Dep't of Mental Health,* 714 F.2d 614 (6th Cir.1983)—a decision that did not address front pay, but that discerned "a national backpay policy" prohibiting the deduction of unemployment compensation benefits from backpay awards in employment discrimination cases—my colleagues on the panel find the majority view, as adopted by the First Circuit, unpersuasive. I myself do not find it unpersuasive.

There is no "national policy," as far as I know, that mandates an award of front pay whenever there has been a violation of the ADA. The decision whether to award or withhold front pay, according to *Lussier* (50 F.3d at 1108), is "within the equitable discretion of the trial court." Such a decision is heavily dependent upon the trial court's analysis of the particular facts of the case before it. If the facts suggest that it would be equitable to allow the plaintiff to recover front pay in the absence of collateral benefits, but inequitable to allow a double recovery, it seems to me that the trial court, functioning as a court of chancery, ought to be able to block the double recovery.

---

1. The defendants argue that when the *Monette* panel said that "the employer will bear the burden of proving that the challenged criterion is necessary," 90 F.3d at 1184, it meant only that the employer will bear the burden of producing evidence of essentiality, not the burden of persuading the jury that a preponderance of the evidence supports a finding of essentiality. I disagree. In context, it seems clear to me that the *Monette* panel was speaking of a burden of persuasion, not a burden of production.

It is arguable, of course, that the payment of collateral benefits necessarily entails a potential windfall for someone, and that as between the victim and the tortfeasor it is always preferable to favor the victim. Some tortfeasors are more at fault than others, however—a small fire department that refused to hire African–Americans, for example, would be far more blameworthy, in my view, than a small fire department that honestly considered it essential for each of its firefighters to be physically capable of fighting fires—and it seems to me that a court of equity should be able to take the degree of fault into account, along with the interests of the taxpayers and other potentially relevant considerations.

Whatever the equities may be in the case at bar, however, it is impossible to tell how much (if any) of the future damages awarded by the jury in this case represented front pay.[2] If the case were to be retried, it would be a simple matter to have any award of front pay stated separately. Given the current state of the record, however, I am inclined to think that it was an abuse of discretion to set off collateral benefits against any part of the future damages—and I am more confident that it was an abuse of discretion to set off collateral benefits against the past damages.

---

**2.** The jury awarded $86,650 in past damages and $413,350 in future damages.