**In re BIG RIVERS ELECTRIC CORPORATION, Debtor.**

**Bankruptcy No. 96–41168–11.**

United States Bankruptcy Court,
W.D. Kentucky,
Louisville Division.

March 26, 1999.

Michael A. Fiorella, Felicia S. Turner, Sullivan Mountjoy Stainbeck & Miller, Owensboro, KY, Mark S. Kaufman, Laura F. Nix, Russell A. Tolley, Long Aldridge & Norman, Atlanta, GA, for debtor.

James G. Bruen, Jr., Genevieve Holm, U.S. Dept. of Justice, Civil Division, Comm. Lit., Washington, D.C., for Rural Utilities Service.

Mark Thompson, Simpson Thacker & Bartlett, New York City, Scott W. Brinkman, Frank P. Dohney, Jr., Mike Grady, Hirn Dohney & Harper, Louisville, KY, for Chase Manhattan Bank.

Jeffrey L. Tanenbaum, Michelle A. Levitt, Weil Gotshal & Manges, New York City, Joan Cooper, Barbara Edelman, Wyatt Tarrant & Combs, Louisville, KY, for Bank of New York.

Joseph J. Golden, Scott Goldberg, Louisville, KY, for U.S. trustee.

Charles W. Ritz III, Parr Richey Obermskey & Morton, Indianapolis, IN, Alan C. Stout, Marion, KY, for Coops.

## MEMORANDUM OPINION

DAVID T. STOSBERG, Bankruptcy Judge.

The Court addresses the fee application of the Examiner which "arrived" after one of the objecting parties sought recusal of the Honorable J. Wendell Roberts who successfully oversaw this monstrosity of a case. Judge Roberts expressed his doubt about the validity of the recusal motion of Rural Utility Service (hereinafter, "the RUS"); however, he opted for recusal to avoid the appearance of impropriety and, more importantly we believe, in the interests of judicial economy.

The core issue raised by the application is whether J. Baxter Schilling (hereinafter, "the Examiner") deserves a "fee enhancement" over and above his usual hourly rate. Several parties objected to the request on a variety of grounds that essentially say "he should not get it because he had ex parte contact with Judge Roberts, but even if he does deserve it, do not make me pay for it." Unfortunately, the objections unnecessarily dwell on this alleged "contact" by the Examiner. The Brief of the RUS epitomizes briefs that equate to scarcely more than an *ad hominem* attack on the Examiner coupled with quibbling about who deserves credit for outstanding results. Indeed the RUS's brief might also be characterized as an attempt to "demonize" the Examiner. Were this a beauty contest instead of a fee application, the Examiner would garner zero votes and be totally ostracized by many of the combatants. The RUS, the debtor, and others also seek to add insult to injury by demanding discovery to grill the Examiner about positions taken in his pleadings.

First, for the many reasons discussed elsewhere in this memorandum, most of the parties do not have any real standing to object to any award except Big Rivers Electric Corporation (hereinafter, "Big

Rivers"), as Big Rivers alone is liable to pay the compensation awarded. As an aside, however, the Court cannot help but note the Attorney General contributed some grandstanding remarks about the supposedly detrimental impact of any sizeable award on Big Rivers' 90,000 customers. Were the Court to grant the Examiner's entire request, it would amount to roughly $48.00 per customer or $1.00 per month over a 4 year period. Query, why was this same "concern" NOT expressed about the fees charged by counsel for Big Rivers. Those fees exceed 10 million dollars just for the postpetition bankruptcy work, and the fees in the year preceding the filing exceeded 6.5 million dollars, which amounts to $183.00 per customer!

### ANALYSIS

Hampered by the fact that this Court did not partake in the extensive proceedings, we undertook a painstakingly detailed review of the record, including the transcripts of the hearings and the pleadings. This mammoth record has generated in excess of 1500 docket entries and over 85 volumes of pleadings.

Fortunately, this Court did not start from scratch as it handled, for a significant period, the related Chapter 11 case of Green River Coal Co., Inc. ("Green River"). Green River was on the long end of the stick of Contract # 527, a long term coal contract that generated profit of $2,000,000.00 PER MONTH for Green River and, conversely, a 2 million dollar per month cash loss for Big Rivers. According to Big Rivers' counsel, the rejection of the contract with Green River saved the debtor 83 million dollars (Stainback—Oct. 30, 1996 Tr. at 3). The conduct associated with the solicitation, negotiation, and implementation of this contract ultimately served as the catalyst for Big Rivers' downfall. Knowing these cases were inextricably intertwined, this Court transferred the Green River case to Judge Roberts to avoid conflicting rulings on identical issues.

A public utility Chapter 11 is rare in the entire United States and certainly unique to this district. Uniqueness aside, one creditor alone, the RUS, had debt of more than one billion dollars and the total debt in the case exceeded one billion two hundred million dollars! But big dollars only touch one facet of the litany of problems plaguing Big Rivers. Some might describe the tales of Big Rivers' escapades as legendary. The Overland Park Report, filed with the Public Service Commission, the Omnibus Report, filed by Big Rivers with the petition, and the opinion of Judge Roberts, *In re Big Rivers Electric Corp.*, 213 B.R. 962 (Bankr.W.D.Ky.1997), recite these problems that lingered right up to the time of confirmation.

What needs to be further noted, to put the overwhelming problems in perspective, is that these financial woes can be traced back to at least 1986 when the RUS filed a foreclosure action on its loan. In 1984, Big Rivers executed what turned out to be the highly unfavorable long term coal contract # 527 with Green River. That link between Green River and Big Rivers ultimately spawned a crooked general manager later convicted of fraud in federal court, as well as the indictment and conviction of several other individuals. Poor management, over 75 lawsuits seeking millions of dollars in damages, a very unsympathetic Public Service Commission, generally poor business conditions, and extremely unhappy customers, especially business customers, pervaded Big Rivers' operation.

The crushing debt, combined with the aforementioned troubles, constrained Big Rivers to pursue a solution under the umbrella of the Bankruptcy Court and it filed a Chapter 11 petition on September 25, 1996. Having endured the rather torturous situation of dealing with Big Rivers' ineptitude outside of bankruptcy court, not surprisingly, several of the major creditors swiftly moved in the first month of this case for the appointment of a trustee or, in the alternative, the appointment of an examiner. To the dismay of Big Rivers, but

to the delight of the moving parties, Judge Roberts ordered the appointment of an examiner.

We digress, temporarily, to draw the important distinction glossed over or ignored by the objecting parties, that is, while Judge Roberts *ordered* the appointment, it was the United States Trustee, pursuant to the statutory process, that *named or appointed* J. Baxter Schilling as the Examiner. We emphasize this distinction as much of the "grumbling" in the briefs deviated from the real issue to focus instead on the *ex parte* contact between Judge Roberts and an Examiner named by the U.S. Trustee.

We find it extremely ironic that the parties, particularly Big Rivers and the RUS, adamantly sought the protection of confidentiality by prohibiting the Examiner from publicly disclosing his findings, yet complained vociferously about *ex parte* contact. To facilitate the overall perspective about the events that unfolded during the case, we recite the specific terms and conditions of the ORDER which provides in part:

> IT IS FURTHER ORDERED that in addition to the powers and duties set forth in 11 U.S.C. § 1106(b), the Examiner shall:
>
> 1) Investigate all allegations set forth in the BC Motion, the Chase/BYN Motion, and MAPCO Motion (collectively "Trustee Motions") concerning the alleged mismanagement and/or breaches of fiduciary duty by Big Rivers;
>
> 2) Prepare a Report, to be filed *under seal* with this Court, concerning the validity of the allegations set forth in the Trustee motions;
>
> 3) Work with Big Rivers and its creditors in (a) facilitating discovery concerning the Trustee Motions; (b) resolving various disputes with creditors, including Green River Coal Co., Inc. ("Green River"); and (c) if feasible, attempt to negotiate a global settlement of the disputes in this case and the development of a consensual plan of reorganization.

> In making this report, the Examiner shall have the right to review all of Big Rivers' files and records, including any files maintained by Big Rivers' attorneys and accountants, except for legal files directly relating to Big Rivers' bankruptcy. *The Examiner shall be prohibited from disclosing any of his or her findings or any of the records and files he or she may review in this matter to any party other than the Court, without prior Court order* ... (Emphasis added.)

*Big Rivers,* 213 B.R. at 966.

Judge Roberts then commented on the Order:

> Thus, the Examiner Order mandated the Examiner to communicate only with the Bankruptcy Court, unless otherwise instructed by the Court. No party, including the PacifiCorp Entities or Green River, objected to this provision in the Examiner Order, nor did any party seek to appeal the Order, or have it modified or limited.

Considering the express provisions of the appointment order, we can only characterize the position of Big Rivers and others as oxymoronic. The debtor cannot "eat with the hounds and run with the hare." If the Examiner were to maintain confidentiality, yet not communicate with the Court, the question is who would review the report? Homer Simpson?!

We digress again to mention that we have reviewed *in camera* the reports filed by the Examiner and it is painfully obvious why Big Rivers strongly opposed publication, as it contains some rather unflattering portrayals of Big Rivers' management and its professionals. Confirmation having been successfully achieved, it would now serve no purpose to publish the report and reopen old wounds covered with the scars of battle. We mention it only in the context that these issues would have served as a nearly inexhaustible supply of fodder for perpetual litigation. To his credit, the Examiner did not pursue the path of litiga-

tion. Instead, he focused on coordinating, coaxing, and pressuring the parties to achieve an outstanding settlement.

To paint the path to settlement required the skill of Michelangelo, or for this case, perhaps Andy Warhol. The Court, in hindsight, now knows that the end product can be described as superior. However, portraying the path to success in any sort of coherent fashion nearly defies description.

When Schilling was appointed as Examiner, Big Rivers had already executed an agreement with PacifiCorp Kentucky Energy Corp. (hereinafter "PKEC"). We quote liberally and extensively from Judge Roberts' recitation of the early history of the case:

### A. HISTORY OF THE CASE.

On September 25, 1996, Big Rivers filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Since the petition date, Big Rivers has continued to operate its business and manage its properties pursuant to Section 1107 and 1108 of the Bankruptcy Code.

Big Rivers is a non-stock, not-for-profit rural electric cooperative which provides electricity to its four member cooperatives. Together, the four member cooperatives serve approximately 90,000 customers in Western Kentucky. A detailed summary of Big Rivers' prepetition problems which led to its Chapter 11 bankruptcy filing are set forth in the "Omnibus Declaration in Support of Big Rivers Electric Corporation's Chapter 11 Filing" ("Omnibus Declaration"). While the Omnibus Declaration was prepared by Big Rivers, it provides a detailed summary of the principal issues relating to the Debtor's financial history. In summation, the document reveals that prior to filing its Chapter 11 bankruptcy action, Big Rivers was faced with a significant number of problems arising from a variety of factors, including, poor management, dishonest employees, unfavorable business conditions, and Big

Rivers' default on its obligation to the Rural Utilities Service ("RUS") f/k/a the Rural Electrification Administration. One month prior to the petition date, Big Rivers purported to enter into a long-term lease agreement with PacifiCorp Kentucky Energy Company ("PKEC"), pursuant to which PKEC would lease substantially all of Big Rivers' generating assets. The Agreement was drafted in contemplation of Big Rivers' Chapter 11 case and, by its terms, required the approval of the Bankruptcy Court.

> Big Rivers' Omnibus Declaration, filed as part of this bankruptcy action, sets forth five primary goals Big Rivers sought to achieve by filing the bankruptcy action:
>
> 1) to restructure its debt obligations which were in default or would shortly go into default;
>
> 2) to reject or restructure certain highly burdensome long-term coal supply contracts;
>
> 3) to resolve its outstanding litigation with various parties;
>
> 4) to "receive judicial approval for consummating a long-term lease transaction involving, *inter alia*, Big Rivers' generation assets;" and
>
> 5) to implement its financial restructuring in a timely fashion.

Omnibus Declaration at p. 7.

The Omnibus Declaration goes on to set forth Big Rivers' strategy, as anticipated as of the petition date, for accomplishing a Chapter 11 reorganization. The key part of Big Rivers' reorganization, as set forth in that document, was the PKEC offer to lease and operate Big Rivers' assets.

The terms of the PKEC lease transaction are discussed in general terms throughout the Omnibus Declaration. Significantly, however, the Omnibus Declaration does not disclose the existence of a "No Shopping" clause in the PKEC Agreement which, at the very

least, greatly limited Big Rivers' ability to consider any offer in any form from any other entity. The Omnibus Declaration erroneously states that the proposed PKEC transaction would achieve the highest cash flow and was in the best interest of Big Rivers' creditors and members.

As subsequent events have unfolded, it has become apparent that the original version of the PKEC offer was not the "best" offer Big Rivers would receive from its assets, nor was it even PKEC's final or best offer.

*In re Big Rivers Electric Corp.*, 213 B.R. 962, 964–65 (Bankr.W.D.Ky.1997).

This Court cannot overstate how ardently Big Rivers portrayed the PKEC Agreement as its financial salvation. For example, early in the case, Al Robison, the alleged expert hired by Big Rivers, testified in response to a question about the prospect of an independent rate examination:

It would be a travesty. It would be in the worst possible interest of the estate. It would be in the worst possible interest—and I said estate, not state—it would be in the worst possible interest of the creditors, of the members, the cooperatives of Big Rivers, and of the employees. Because it would, of necessity, preclude the implementation of the PacifiCorp deal, which we know, and are going to be able to defend, has the best maximum value and benefit for all of those concerned (Nov. 13, 1996 Tr. at 150).

On that same date, Robison embellished his opinion with such words as "insurmountable" when stating that no better plan could be developed. Yet despite persistent and thorough questions about the reasons from Judge Roberts and others about pursuing alternatives, Robison never once directly answered that the real reason Big Rivers did not pursue alternatives was the No Shop Clause in the PKEC Agreement. It is EXTREMELY NOTEWORTHY that neither Big Rivers' witnesses, nor its counsel, disclosed to the Court the existence of the No Shop Clause, a provision that contractually blocked Big Rivers from seeking bids in competition with PKEC. Indeed, Mark Kaufman, one of Big Rivers' lead lawyers, stated that the PKEC deal would serve as the "cornerstone" of the reorganization process and be a "central element of the case" (Oct. 2, 1996 Tr. at 44–45), but never mentioned the No Shop Clause. ONLY AFTER MONTHS OF INTENSIVE INVOLVEMENT BY THE EXAMINER did Big Rivers disclose the clause, and then, it was "buried in an unrelated sort of miscellaneous section at the end of the documents" (March 7, 1997 Tr. at 100).

Big Rivers' obsessive devotion to the PKEC deal epitomizes not only ineptitude, but a troubling lack of candor with the Court. What is puzzling, if not downright ridiculous, is that Big Rivers' professionals would subsequently try to claim the credit for generating the extra money raised by the auction recommended by the Examiner and ordered by the Court (July 1, 1997 Tr. at 22). Big Rivers fought strenuously to enforce the PKEC agreement to the point, in the early going, of even objecting to questions posed to its expert, Robison, about the PKEC deal (Oct. 30, 1996 Tr. at 135). One has to wonder what sensible motivation Big Rivers had for pursuing this path of obfuscation and supporting an agreement that "violated public policy." The District Court opinion of the Honorable Joseph McKinley affirmed Judge Roberts and is the law of the case. Judge McKinley succinctly decries Big Rivers' pursuit of the contract with the No Shop Clause:

This prohibition violates the underlying policy of the Bankruptcy Code to maximize the value of the estate for the creditors by stifling the bidding process for the assets of the debtor. The No Shop Clause places Big Rivers in a position of rejecting subsequent proposals to purchase its assets for a greater amount, thereby breaching its duty to the estate.

This Court particularly notes that this No Shop Clause completely locked up the debtor by preventing communication with any third party submitting a bid, whether that bid was higher or lower. Unlike the window shopping provisions in the above mentioned cases, such a condition provides no room for the debtor to fulfill its fiduciary obligation. Under the law, a contract containing such a clause which prevents a party from fulfilling his or her fiduciary duty is void as a violation of public policy. *Kessler v. Jefferson Storage Corp.*, 125 F.2d 108, 110 (6th Cir.1941) (holding a contract entered between corporation and third party void because third party agreed to pay a portion of the profits on such contract to corporation's president). Thus, the bankruptcy court did not err in holding the Omnibus Agreement void as against public policy.

*Pacificorp Kentucky Energy Corp., et al v. Big Rivers Electric Corp., et al. (In re Big Rivers Electric Corp.)*, 233 B.R. 739, 752–753 (W.D.Ky.1998).

Moreover, it not only violated public policy, it violated the debtor's fiduciary duty to pursue the highest and best offer. Big Rivers wasted millions of dollars in attorney fees seeking approval of a quixotic plan based on the PKEC contract that violated public policy and violated the fiduciary duty of the debtor.

The management of Big Rivers seems more than happy to pay its own attorneys but strenuously objects to paying fees to the Examiner. The Court can perhaps understand the rather awkward situation of a client objecting to the fees of its own attorney; however, the Court cannot fathom why the four Cooperatives (hereinafter, "the Coops") and their counsel failed to object to the fees. We surmise that this failure is tantamount to self preservation for the Coops. What SHOULD have happened in this case is that the entire coop structure should have been eliminated and LG & E or other utilities should have been authorized to make an outright purchase. The Coops paid their own attorneys over one half of a million dollars, and, as far as this Court can ascertain, contributed absolutely nothing to the ultimate outcome of the case. We further surmise that had the parties not been "drained" by securing defeat of the PKEC Contract and focused on maximizing a sale, they would have further benefitted the customer by eliminating the Coops. Instead, the parties, exhausted from overcoming Big Rivers' folly, embraced the LG & E offer that at least provided another 100 to 140 million dollars.

The Court cannot discern how it would be fair and equitable to reward counsel for Big Rivers for pursuing an unconfirmable plan, yet deny enhanced compensation to an Examiner who prodded, cajoled, and coordinated the parties to the point of generating somewhere between another 100 to 140 million additional dollars for the estate. It is patently clear that a significant portion of the outstanding effort expended by the Examiner resulted from hard line positions taken by Big Rivers. Thus, it is Big Rivers and Big Rivers alone, under any equitable approach, under the provisions of the Bankruptcy Code, and under the terms of the Order of Confirmation, that must pay the cost of administration which includes the compensation awarded to the Examiner.

Having briefly commented about the role of the Coops and how they stood idly by and supported Big Rivers, the Court feels also constrained to comment in greater detail on the role of the RUS, particularly in light of its objection to the compensation sought by the Examiner. The position of the RUS is puzzling, if not downright perplexing. The Court cannot understand the "lemming-like" attitude of the RUS as it blindly supported Big Rivers' pursuit of the PKEC plan. During the hearing held on February 19, 1997, counsel for the RUS decried the Court's consideration of an auction and strongly supported the PKEC deal. The RUS even

argued that "chaos" might ensue if the Court authorized an auction (Feb. 19, 1997 Tr. at 85). The Court can only surmise that some sort of jealousy lingers over the Examiner's ability to coordinate and concoct a settlement. The RUS apparently lost its objectivity in dealing with Big Rivers and let its sympathy for the individuals at Big Rivers distract it from its real objective of recovering the maximum amount of money available for the taxpayers of this country.

"Mr. Bruen: Your honor, James Bruen for the R.U.S. I've been involved with Big Rivers since 1984. In 1984 I filed a foreclosure action that was filed before Judge Johnstone. We spent several years before him, extended negotiations, looked around the Court and just about every face has changed, members of the Bar have changed, different faces, we reached a debt restructure in '87. There was a round of litigation over that between the aluminum companies and major customers with the Big Rivers system at Big Rivers. I think its safe to say that we the government, have had sort of a love-hate relationship with Big Rivers for the last several years. It's been a very tumultuous time. As Big Rivers has gone through foreclosure, debt restructure, allegations and then convictions of commercial bribery, convictions of its coal suppliers. We've been dealing with them continually...." (Sept. 25, 1996 Tr. at 108–109).

Having filed a foreclosure action in the mid 1980s, the RUS fiddled (like Nero) for 10 LONG YEARS and accomplished virtually nothing while Big Rivers (like Rome) burned.

■ The Examiner jumped into the fray and, in 9 SHORT MONTHS, spurred a superb solution. Begrudgingly, in response to questions from the Court, the RUS acknowledged that, as a DIRECT RESULT of the unraveling of the PKEC deal caused by the Examiner's tenacity, the RUS received an ADDITIONAL 30 to 40 million dollars. Apparently this is "chump change" to the RUS, an agency that very BELATEDLY decided to attack the Examiner by saying his efforts were "shrouded in secrecy." OF COURSE the efforts were shrouded in secrecy if the Order of Appointment requires confidentiality. The record reveals that as early as November of 1996, the Examiner realized that his duties and efforts actually encompassed those normally assigned to a creditors' committee or a trustee, and he advised various creditors he would seek some sort of percentage compensation. If any creditor or party in interest was affronted, why did NO ONE file a motion THEN to terminate the Examiner's appointment. This Court simply does not believe that the RUS was unaware the Examiner would seek some sort of a percentage fee. Moreover, we accord no weight the view of the RUS for the simple reason that it will not be aggrieved by any order of this Court, that is, only Big Rivers will be directed to pay the award. We keep in mind that the record reveals that Judge Roberts specifically inquired about Big Rivers' ability to pay any compensation awarded and Big Rivers assured Judge Roberts any compensation awarded would NOT affect the feasibility of the plan to pay the RUS and other creditors (June 1, 1998 Tr. at 92).

This Court also feels that the RUS shares in the responsibility for FAILING TO DISCLOSE the No Shop Clause in the PKEC agreement. James Bruen for the RUS admitted: "Your honor, I and my client were kept informed at various stages of that process" (Feb. 19, 1997 Tr. at 82). Why did the RUS not clear up any question early in the hearings? The RUS already knew by the time the bankruptcy was filed in September, 1996 that Big Rivers had been manipulated by a crooked general manager now convicted of criminal activity and that further investigations were being conducted. Yet it slavishly and foolishly supported Big Rivers. Even if the RUS forgot about the No Shop Clause, it certainly knew that Big Rivers

had a fiduciary duty to maximize its recovery. Likewise, did the RUS not have a duty to the taxpayers to maximize its recovery instead of offering lemming-like support to Big Rivers? The old axiom of "birds of a feather" applies to the RUS, an agency that now wants the Court to bite the hand of the Examiner that fed it at least another 30 million dollars. The RUS should "thank its lucky stars" that Judge Roberts ignored its lemming-like support of the PKEC plan and its failure to raise the issue of the No Shop Clause, take its extra millions, and "get out of dodge." To put it bluntly, this Court gives no credence to a party that perpetually takes suicidal positions that cost it money!

Finally, before specifically addressing the fee application, the Court will remark about the request of the parties to take proof. We again note the irony of such a request. On the one hand, all of the objecting parties stridently complained about the *ex parte* contact and asserted that such contact compels the Court to deny the application. Yet they want the Examiner to keep the information obtained confidential. Such a proposition is patently absurd. The Court has scrutinized the sealed report and notes it would be impossible for the Examiner to recite the details of his efforts without breaching the confidentiality requirement of the Order. The report does not paint a pretty picture, but it is history. Now that the plan has been confirmed, disclosure would only air dirty laundry and benefit no one, least of all Big Rivers' management and professionals. What purpose would serve, furthermore, for the Court to hear testimony from various lawyers about the details of their extensive, heated negotiations leading to a comprehensive settlement. The Court will not condone a parade of horrors in the form of extensive discovery about NEGOTIATIONS in which all parties participated at different times to varying degrees. The Court can easily discern that counsel got on each other's nerves, and animosity (Sept. 28, 1998 Tr. at 60) is to be expected in the course of negotiations involving over a billion dollars.

## ANALYSIS OF THE REQUEST

We begin by noting that we have the benefit of the context under which Judge Roberts entered the Order directing the appointment of an Examiner. Specifically, Judge Roberts remarked:

While the appointment of a Trustee may well have been in the best interest of the creditors, this Court was concerned that it was too early in the case to take control away from Big Rivers. The Court did conclude, however, that the appointment of an Examiner was required by 11 U.S.C. § 1104(c)(2) as a matter of law due to Big Rivers having fixed, liquidated, unsecured debts in excess of $5 million. *In re Revco D. S., Inc.,* 898 F.2d 498 (6th Cir.1990).

The use of the term "Examiner" was, however, somewhat of a misnomer in this case, as the Order directed the "Examiner" to have greatly expanded powers and duties in addition to those conveyed upon examiners under the general provisions of § 1006(b) (Oct. 20, 1997 Tr. at 44).

While well intentioned at the time, in hindsight, it may well have served all of the parties to appoint a trustee because a trustee would have immediately abandoned the quixotic pursuit of the PKEC agreement and immediately proceeded to auction the estate to the highest bidder. In essence, the Examiner acted as a "quasi-trustee" when he ardently urged the Court, over the objection of Big Rivers, to auction the estate. It would be, perhaps, most apropos to enter an order *nunc pro tunc* appointing or designating Schilling as a trustee. Extensive research, including review of hundreds of cases by the Court, provides some general guidance, but no compelling authority to fit the circumstances of this case. Having entertained such a novel approach, we decline to resort to legal artifice to reach a just result. Moreover, using the pure trustee formula

would compel the Court to award a sum in EXCESS of the compensation requested.

We elect, instead, to review the application utilizing as our primary guideline the frequently cited case of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), which the 6th Circuit has often cited with approval—most recently in *Hamlin v. Charter Township of Flint,* 165 F.3d 426 (6th Cir.1999). The Court employs this guideline as preferable to the common fund approach advocated by the Examiner. The Court believes that, in a very real sense, the rationale of the common fund approach overlays, or is interspersed in, the 12 *Johnson* elements and further reiterates its recognition that the Sixth Circuit has approved the *Johnson* approach. Moreover, the common fund approach has been used sparingly in bankruptcy cases. Such an approach would compel the Court to somehow equitably allocate responsibility for payment of the compensation awarded—a result this Court does not feel is justified (except for the RUS)—and would be outside the scope and terms of the Order of Confirmation. In other words, this boils down to how much Big Rivers should pay the Examiner for the outstanding results he achieved.

We enumerate the 12 *Johnson* factors for clarity and ease:

(1) the time and labor required;

(2) the novelty and difficulty of the questions;

(3) the skill requisite to perform the legal service properly;

(4) the preclusion of employment by the attorney due to acceptance of the case;

(5) the customary fee;

(6) whether the fee is fixed or contingent;

(7) time limitations imposed by the client or the circumstances;

(8) the amount involved and the result obtained;

(9) the experience, reputation, and ability of the attorneys;

(10) the "undesireability" of the case;

(11) the nature and length of the professional relationship with the client; and

(12) awards in similar cases.

*Hamlin, et al. v. Charter Township of Flint,* 165 F.3d 426, 437 (6th Cir.1999) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 430 n. 3, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) [summarizing the *Johnson* factors]).

Novel and difficult issues permeate this case and the Court, in its experience as a jurist and lawyer, knows of no other case over the last 25 years that would qualify as more novel or more difficult in this district. We quote liberally from the remarks of many of the people extensively involved in this case.

A). Michael Fiorella, one of Big Rivers' counsel, stated: "a case larger by far than any case ever filed in the State of Kentucky, to my knowledge, and probably one of the largest ever in the United States.... In the top ten of all times in the United States" (Oct. 2, 1996 Tr. at 96).

B). Fiorella again said: "Certainly, your Honor, it is beyond dispute that this case is enormous in both size and complexity ... One of the largest and most complex cases in bankruptcy" (Feb. 19, 1997 Tr. at 49 and 138).

C). Fiorella again stated: "As this court has noted and as many parties have reminded the Court and others on numerous occasions, this is one of the largest bankruptcy cases in history. We're talking about a debtor with assets in excess of seven, eight, nine hundred million.... Over 1.4 billion dollars in debt ... Certainly this is one of the most significant businesses in Kentucky and one whose viability is crucial to the Western Kentucky economy ...: All of these things

together make this an extremely complex case" (July 1, 1997 Tr. at 19).

D). Judge Roberts commented: ". . . mammoth size case . . . confirmed in ten months time" (Aug. 31, 1998 Tr. at 13).

E). Mark Thompson, counsel for Chase, added: ". . . one of the largest, if not the largest Chapter 11 case in the State of Kentucky. This courtroom is packed with lawyers. The debtor, whom it is the examiner's task to investigate, has numerous lawyers at its command. In order to effectively perform its duties, it appears as a practical matter that the examiner must retain some amount of professional assistance. It is not humanly possible with a company of this size and a case of this size, facing lawyers possibly in opposition, that Mr. Schilling or any other person perform these duties by himself without damaging his other responsibilities to other clients" (Dec. 11, 1996 Tr. at 35).

We reiterate that the Court recalls no other case so bedeviled with such problems as mismanagement, fraud, 75 lawsuits, a related complicated Chapter 11, billions of dollars, contentious parties, and an unsympathetic Public Service Commission.

Next, to call the case undesirable is a true understatement in light of the risk that the debtor would crash and have all of the assets fall under the RUS if no one bid at the auction. Undoubtedly, the RUS feared any type of auction. As Bruen commented:

"In fact, here, assuming there is what we characterized as a better result, it doesn't necessarily mean we get to confirmation, or that we get to confirmation easier.

I heard Mr. Miller promise that if you put new value on the table he had no intention of giving it all to RUS. Now I don't say he has to have that intention.

But I can tell you he's promising me that if he were the successful bidder we're going to go through a round of bickering between all the constituencies again.

If one of those constituencies then decides that its interests are better to align with the disappointed bidder, or with PacifiCorp, we may have chaos. We may not have confirmation. Or if we have confirmation we may have a confirmation that's disputed and litigated.

This is not to disparage LG & E. We have not been dealing with them at the length we've been dealing with PacifiCorp. But we are comfortable with the structure of the deal with PacifiCorp and the deal.

The bidding process that is proposed leaves us uncomfortable. We could get no bid. We could get bids that are lesser. Who insures us against that? Who'd be liable? Who would make good the difference?

If there's more value on the table, we get bickering. Who determines who won? And who's bound by that determination?

If we go to confirmation and people do not vote for it, what happens then? What's the aftermath?

There's no assurance in this that the winner will have a confirmable plan. There may be litigation to follow.

Now, understand again that this is a fragile coalition that does exist. It could fall apart" (Feb. 19, 1997 Tr. at 84–85).

Beyond cavil, all of the parties would have then "blamed" the Examiner while urging that he be sent packing with no compensation.

Our description of the case denotes the extraordinary skill required of the Examiner and further conveys the sacrifice required, including the preclusion on accepting other work. The multitude of references to the Examiner throughout the transcripts exemplify and epitomize

how all parties relied on his skills and expertise to keep the parties on track. We highlight a few of these references in chronological order:

1) The remarks by Robison and Bruen on October 30, 1996, only 12 days after the Examiner was appointed, where Bruen referenced his report and Robison expressed some concern about his possible recommendation (Oct. 30, 1996 Tr. at 13 and 150).

2) Counsel for Chase talks about the difficulty of the task saying, "It is not humanly possible." Further in the transcript, Barbara Edelman, one of the bank's counsel, suggests, "it would be worthwhile to have Mr. Schilling also act to see if he could get the parties together, the counsel for all of these bidders, and see if we can't come back to you with something more coherent" (Dec. 11, 1996 Tr. at 21, 22, 26 & 52).

3) Remarks throughout the transcript dated February 19, 1997 are replete with references to the Examiner including:

(a) Fiorella talking about efforts to settle the pivotal Green River claim: "At the point of rejection, Big Rivers called upon the Examiner to see if he could assist in those negotiations. The Examiner conducted some extensive negotiations with Green River Coal" (Feb. 19, 1997 Tr. at 16).

(b) Richard Miller, counsel for LG & E, "suggested the Examiner" to oversee the bidding process (Feb. 19, 1997 Tr. at 62 and 163–167).

(c) Judge Roberts remarked: "suddenly through the efforts of the Examiner 40 to 70 more million dollars appeared on the table" (Feb. 19, 1997 Tr. at 74–75).

(d) IT IS IN THIS TRANSCRIPT THAT Big Rivers doggedly defends the PKEC deal and the No Shop Clause and still clung to the idea that the No Shop Clause did not violate its fiduciary duty. Fiorella stated:

"I would point out that LG & E's motion relies very, very heavily on the Examiner's report. It was one that was produced after about a week or two of work on what is an extremely difficult process. Thousands and thousands of pages of documents . . ."

Yet he contended the report was "inaccurate" (Feb. 19, 1997 Tr. at 151–152).

It is this record that portrays the tension between Big Rivers and the Examiner.

(e) The Examiner notes that Big Rivers would not provide documents to Enron, one of the potential bidders, until the Examiner intervened (Mar. 19, 1997 Tr. at 62).

(f) Miller, counsel for LG & E, references Schilling's work toward a settlement on the Green River Coal matter (May 13, 1997 Tr.).

(g) Fiorella remarked that he was "waiting on the Examiner" to resolve the Green River matter (June 3, 1997 Tr.).

(h) Fiorella praises the Examiner (July 1, 1997 Tr.).

As to time limitations, Judge Roberts observed:

"This case moved very, very rapidly. In fact, it moved more rapidly than many other Chapter 11 cases in this district of a million dollars or less. And this case is over a billion dollars. So this case has moved with great speed. And that's attributable to the efforts of all parties" (Oct. 20, 1997 Tr. at 44).

In fact, often during the pendency of this case, the torrid pace forced all three judges in this District to continue other cases to allow the attorneys sufficient time to complete this case.

The Court need not dwell further on the staggering sums of money involved in this case—a billion and a half dollars!

We come to the guideline of usual and customary fees and whether the fee was fixed or contingent. The usual and customary fee of a trustee is based on a percentage and, if this case were based on any sort of percentage fee, then the award could easily be in the tens of millions of dollars. As for awards in cases, the Court knows of a few other public utility cases throughout the country (See, e.g., *In re Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305 (7th Cir.1995), and *In re Cajun Electric Power Cooperative, Inc.*, 150 F.3d 503 (5th Cir.1998)), however, none of those cases come close to matching the fact pattern in this case. What we do know is that both of the cases took years and years to complete and in *Cajun*, Judge Schiff (we are sure to his chagrin) recently issued an opinion in excess of 100 pages to DENY confirmation. *In re Cajun Electric Power Cooperative, Inc.*, 230 B.R. 683 (Bankr. M.D.La.).

We further note that in such a sizeable case the Examiner could have easily justified hiring an accountant, along with a "boatload" of other professionals to excavate deeply into the ruins of Big Rivers. Indeed, to add another bit of unsurprising irony, we note that the RUS opposed the hiring of any professionals to assist the Examiner (Dec. 11, 1996 Tr. at 22). This Examiner, a highly skilled litigator, could have easily elected to recommend lots of litigation and forsake settlement discussions. What would it say to this Examiner and other professionals if the Court effectively encourages pursuit of a settlement that produces a superior result (which this Examiner did), and then blithely says that, based on the Code provisions, it will not consider rewarding you with an enhanced fee. The Court CANNOT OVERSTATE the degree of difficulty of this case. It is not embellishment to say that if ever there were a case in which a professional deserves an enhancement, it is this case.

The RUS, and many other creditors, dawdled and bumfuzzled with Big Rivers for 10 years and got nowhere. Then, confronted with a Chapter 11, the RUS supported a plan based on a contract that violated public policy. The RUS knew, or SHOULD HAVE KNOWN, pursuit of this quixotic plan was nothing short of a pipe dream. Yet even after a successful auction occurred, the RUS persisted with a vexatious vendetta designed to not only thwart enhanced compensation but unfairly deprive the Examiner of his entire fee.

Finally, we note that not only did the Examiner perform duties much like a trustee, he also performed many functions ordinarily performed by a creditors' committee. Judge Roberts wisely spared the estate the expense of appointing a counsel for a creditors' committee (Nov. 13, 1996 Tr. at 21). Had counsel been appointed, however, it is not difficult to project that those fees would have amounted to 4 or 5 million dollars, especially considering that fees for debtor's counsel exceeded 10 million dollars. Now, in lieu of paying those fees and other professional fees of a committee, Big Rivers pays only the fee of the Examiner.

In his comments near the end of the case, Judge Roberts offered some very candid, complimentary remarks about the performance of the Examiner:

Early on in this case motions have been filed to appoint a trustee. And at that time there appeared to be sufficient allegations that, if proven, the Court would have appointed a trustee in this case. But it was very early on in the case.

So rather than go through extensive hearings creating further animosity between the parties, the Court chose to appoint an Examiner and charge the Examiner with the duties as set forth in that order. The last duty being to try to settle discovery disputes between the parties; but, more importantly, to achieve a global settlement of all matters concerned in this case.

Now, I'm not suggesting to counsel that the Examiner solely, with only his own work, caused the settlement, but he materially participated in it; I had I don't know how many—I'm certain, many conversations with counsel.

Each time we have met, we have had a room full of lawyers in this case. And each person here comes to the Court well apprised of the position that you take on that day's hearing, as well as the entire case.

In other words, we got a room of 50 very bright lawyers. All of you have practiced this case from a perspective of great intelligence. All of you have done a wonderful job in settling the issues.

*I doubt that the case would have been settled now. I doubt that the case would have been settled several years from now had it not been for the encouragement of the Court and the encouragement of the Examiner to get the parties together.*

I observed frequently at the hearings that a month had gone by since the last hearing and I would asked: Have you discussed this matter since the last hearing and I would see heads begin to shake no, or not that particular issue. And I would suggest that it be discussed then. And frequently all of you would leave the room and you would come back periodically and report in, ask for more time.

We have had hearings that lasted for a day, two days, sometimes even longer, with the parties periodically telling me that they're still making progress, if I could hold off and just give some more time, efforts were being made to resolve the matter.

*The Examiner, in my view, was materially—materially significant in achieving that settlement and he has fulfilled that portion of my order* (Sept. 28, 1998 Tr. at 47–50, 59). (Emphasis Added)

We find it readily apparent, after an independent review of the record, that

those remarks are not only well-founded but decidedly understated. The real shame is that the case had to be transferred when the motion for recusal originated with a creditor which this Judge finds has no standing. The RUS originated the recusal motion soon after Judge Roberts' effusive praise in September of 1998. The RUS will not be out one red cent, yet it requested recusal to take a "cheap shot" at Judge Roberts and the Examiner. We easily determine, in light of the timing of the motion, that the only reason the RUS wanted Judge Roberts removed was because of his laudatory remarks about the Examiner!

Before awarding a fee, the Court notes that it has the benefit of knowing the amount of the other fees already awarded this case. Specifically, we refer to pleading number 1469, a Notice for Objections, that sets forth amounts in excess of 13 MILLION AND 700 THOUSAND DOLLARS, including almost 10 million dollars for Big Rivers' counsel:

(1) Arthur Anderson — $1,169.118.50
(2) Mark Kaufman (one of Big Rivers' attorneys) — $6,713,240.05 (plus over ½ million in expenses)
(3) Sullivan, Mountjoy (another Big Rivers' attorney) — $2,243,411.90 (Plus over 248,000 in expenses)

Additional fees incurred by several other parties include:

(1) Chase Manhattan — over 1,500,000;
(2) Bank of New York — over 1,700,000;
(3) the Coops — over 500,000; and
(4) LGE—unknown — but easily estimated to be several million dollars.

These fees exceed 20 million dollars. At least half of that twenty million has already been paid to counsel for Big Rivers, yet does not include work done after confirmation!

Twenty million dollars, to belabor the obvious, is a lot of money. However fees, like life, must be viewed in perspective.

██ Despite the enormous difficulties encountered, the Examiner spurred success through extraordinary effort. From the Court's perspective and based on our rigorous, exhaustive and lengthy scrutiny

of the entire record, the Examiner deserves enhanced compensation. Thus, the Court has this same date entered an Order awarding enhanced compensation under the *Johnson* guidelines in an amount equal to 4 times the base compensation already awarded. Total final compensation will be $527,641.00, plus 4 times $527,641.00 which equals $2,110,564.00, for a grand total of $2,638,205.00.

Viewed in isolation and taken out of context, this amount might be portrayed as huge or even staggering. However, when compared to frivolous millions of dollars wasted on the PKEC contract, the amount is extremely reasonable—indeed a downright bargain. In the words of one of the counsel in the case, "Big Rivers paid to structure the PKEC deal, pursue the PKEC deal and then unwind the PKEC deal" (May 4, 1998 Tr. at 57) [Remarks by Thompson]. Out of all that work, Big Rivers derived scant benefit. Big Rivers posits the proposition that the PKEC deal served as a building block from which it built the plan. However, from the viewpoint of this Court, it served as nothing more than an extravagant diversion that distracted the parties from devoting their efforts to what should have been their true quest.

Arthur Andersen "earned" fees in excess of $1,000,000 consulting primarily on the PKEC deal. It's contribution falls significantly short of the Examiner's contribution. The Coops, the real owners of Big Rivers, frittered away over $600,000.00 on attorney fees, yet the record reveals their presence equated to floccinaucinihilipilification (See *The Random House Dictionary of the English Language* (2d ed.1987)), i.e., their attendance adduced absolutely no benefit for the estate.

In bankruptcy parlance, this case should have been a simple liquidation. Big Rivers should have been sold outright and then dismantled along with the worthless Coops leaving the customers in the hands of an efficient well run utility like LG & E! Stark comparison of the benefit bestowed by the Examiner, in excess of 100 million dollars, to the zero benefit generated by the Coops, reinforces the Court's feeling. We hasten to add that the Examiner has had to unfairly endure scorn, derision, and comments by some of the objecting parties, whose unfounded accusations have proved to be totally devoid of merit. The Examiner, having been compelled to fight for his fees, will at least earn some additional compensation for enduring this battle.

Finally, albeit beyond the scope of the issue before the Court, we do not hesitate to suggest reduction of the fees awarded to counsel for Big Rivers in an amount equal to the additional fees awarded to the Examiner. How appropriate it would be to reduce any award for pursuing a plan based on a contract that violated public policy and violated the Debtor's fiduciary duty, as well as for failing to immediately and forthrightly disclose the No Shop Clause. We recall that Big Rivers' counsel assured Judge Roberts it would make enough money to pay ALL of the fees awarded and gather there will be enough money to pay everyone. Just to make sure, however, this Court will direct Big Rivers to report to Judge Roberts that it has sufficient funds to pay all fees before paying any other professional fees in this case.